STATE of Iowa, Appellee,

v.

Charles Robert CAMPBELL,
Jr., Appellant.

No. 63050.

Supreme Court of Iowa.

July 16, 1980.

Harold J. DeLange II, Wehr & DeLange, Davenport, for appellant.

Thomas J. Miller, Atty. Gen., Kathy Krewer, Asst. Atty. Gen., William E. Davis, Scott County Atty., and Richard J. Brown, Asst. Scott County Atty., for appellee.

Considered by LeGRAND, P. J., and UHLENHOPP, McCORMICK, ALLBEE and McGIVERIN, JJ.

ALLBEE, Justice.

Defendant Charles Robert Campbell, Jr. appeals his conviction of operating a motor vehicle while under the influence of alcoholic beverage, a violation of section 321.281, Supplement to the Code 1977. Finding no merit in the two grounds of error that defendant asserts, we affirm the conviction.

I. *Use of excluded evidence for impeachment purposes.* The first error defendant asserts was the admission of evidence concerning the administration and results of a breath test. Defendant took the test on May 12, 1978, following his collision with another car in Davenport and subsequent arrest for OMVUI. Immediately before taking the test, he was asked to sign an implied consent form, which, *inter alia*, stated, "YOU ARE NOT ENTITLED TO CONSULT AN ATTORNEY PRIOR TO CONSENTING OR REFUSING TO THE WITHDRAWAL OF A BODY SPECIMEN."

Before trial, defendant filed a motion to suppress all evidence concerning the taking and results of the breath test. Trial court granted the motion because of the impropriety of the form's statement in view of our decision in *State v. Vietor*, 261 N.W.2d 828 (Iowa 1978). *Vietor* indicated that the statutory predecessor to section 804.20, Supplement to the Code 1977, section 755.17, The Code 1977, granted defendants charged with OMVUI a limited statutory right to

counsel before deciding whether to take or refuse a chemical test under implied consent procedures, and held that denial of the opportunity to exercise that right required that evidence of the defendant's refusal to take the test be excluded from the OMVUI trial. *Id.* at 830–32.

At trial, near the conclusion of presentation of evidence by the defense, the State asked permission to introduce evidence regarding the breath test solely for purposes of impeachment. After listening to arguments of both parties, trial court ruled the rebuttal evidence admissible for purposes of impeachment,[1] citing the rule followed in *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); and in *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). That rule is that unlawfully obtained evidence ruled inadmissible against a defendant in the prosecution's case in chief may nonetheless be used to impeach the defendant's assertions made upon direct examination.

In addressing this ground of asserted error, we first note the common issues involved in cases of this nature which are not raised by the parties' arguments here. First, defendant does not here dispute the general validity of the impeachment exception to the exclusionary rule, which was accepted by this court in *State v. Washington,* 257 N.W.2d 890, 894–96 (Iowa 1977), *cert. denied,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978). Nor does he claim that the breath test was improperly performed or that for any other reason its results were unreliable. Finally, the State does not assert that any basis for its rebuttal was provided by defendant's statements elicited during cross-examination. Consequently, the narrow issue before us is whether defendant's statements on direct examination opened the door to permissible impeachment by suppressed evidence.

We conclude that they did. The prosecution carefully excluded from its case in chief any reference to the administration or results of the breath test. Its case against defendant consisted of the testimony of witnesses who observed defendant on the night in question to be lacking physical coordination; speaking in a slurred, hesitant manner; emitting an odor of alcoholic beverage; and suffering from watery, bloodshot eyes and a flushed face. Defendant then presented evidence, by his own testimony and that of acquaintances, that he normally speaks in a slow and deliberate fashion, has watery eyes, walks slowly and with a limp and gives off a medicinal type of odor. His unusual gait and lack of balance while standing he attributed to back problems. Additionally, he testified that, because of other health problems, he frequently sipped a cough medicine, which had an odor. Defendant also testified that he had drunk only two or, at the most, three drinks in the approximately two-hour period he spent at a restaurant-lounge before the accident occurred. Finally, defendant called as his witness Dr. Perkins, a physician serving as Scott County Medical Examiner, whom he asked to estimate the blood-alcohol level of a person of defendant's weight who had consumed three one-ounce drinks of alcohol over a two-hour period. Dr. Perkins responded that the level would be .03% by weight. He also stated, in response to questions propounded during his direct examination, that this level would not affect a person's ability to drive, that the level at which driving becomes dangerous is .1% and that six or seven drinks would have to be consumed in a two-hour period to reach that level. During the cross-examination of Dr. Perkins by the State, he testified that a person of defendant's size would have to consume eight to ten drinks within a two-hour period to attain a blood-alcohol level of .175%. It was at the conclusion of Dr. Perkins's testimony that the State sought and received permission to introduce testimony concerning the manner of administration and results of the breath test given to defendant immediately

---

1. The record indicates that trial court gave a limiting instruction, permitting the jury to consider the breath test evidence only for purposes of impeachment.

following his arrest. Those results showed that his blood-alcohol level was .175%.

■ By stating that he had only consumed two or three drinks and then offering Dr. Perkins's testimony to explain the physiological effects of such consumption, defendant initiated the specific issues of the quantity of alcohol he had consumed and the resultant level of alcohol in his blood when he was driving. He thus opened himself up to rebuttal on these issues by the contradictory evidence of the State.

Defendant argues that he did not thus open the door to rebuttal because his direct examination contained no reference to the effect of the drinks upon him, the alcohol level of his blood or the breath test. He reasons that the results of the test were not contradictory to his statements, but rather to Dr. Perkins's statements. In conclusion, he asserts that as statements elicited from defendants during cross-examination have generally not been permitted to be used as a basis for impeachment by suppressed evidence,[2] statements made by a different defense witness likewise should not be impeachable with suppressed evidence.

We cannot agree that the results of the breath test were used to impeach Dr. Perkins's testimony. While it is true that trial court ordered that the State should be afforded the opportunity to impeach statements of either defendant or Dr. Perkins, its rebuttal evidence, in fact, contradicted only defendant's factual assertions. Dr. Perkins's testimony was expressed in terms of answers to hypothetical questions. It merely provided a conversion into blood-alcohol levels of the quantity of alcohol defendant said he had consumed. It did not in any way independent from defendant's testimony attempt to establish the amount of alcohol he actually had consumed or the actual alcohol level of his blood.

Of course, the inconsistency between defendant's testimony regarding his alcohol consumption and the State's evidence of the test results was most clearly shown by Dr. Perkins's conversion of defendant's testimony into blood-alcohol levels. However, Dr. Perkins's testimony regarding blood-alcohol levels was obviously solicited by defendant as part of his trial strategy. Thus, it did not suffer from the basic infirmity claimed to be associated with impeachment based in particular on a defendant's cross-examination: passing control of the impeachment exception to the exclusionary rule from the defendant to the prosecutor because of the broad latitude in cross-examining opposing witnesses traditionally accorded parties. *See United States v. Havens,* —— U.S. ——, ——, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559, 567 (1980) (Brennan, J., dissenting).

In response to defendant's argument that the rebuttal evidence was not sufficiently contradictory to his assertions made on direct examination to qualify for the impeachment exception, we have found helpful an examination of the nature of the contradiction required by other authorities. Although the exclusionary rule involved here is founded on our interpretation of a state statute while that involved in many of the examined cases was based on federal constitutional law, the competing policy concerns represented by an impeachment exception to both types of exclusionary rules make those cases persuasive here. On the one hand are the main purposes of the exclusionary rule of deterring illegal police conduct and preserving judicial integrity. *See, e. g., Elkins v. United States,* 364 U.S. 206, 217–18, 220–23, 80 S.Ct. 1437, 1444–47, 4 L.Ed.2d 1669, 1677–81 (1960). On the other hand is the "strong policy against countenancing perjury," *New Jersey v. Portash,* 440 U.S. 450, 458, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979), also detractory to judicial integrity, *People v. Disbrow,* 16 Cal.3d 101, 127, 127 Cal.Rptr. 360, 377, 545 P.2d 272, 289 (1976) (dissenting opinion). The bases of this policy are "the importance

---

**2.** This has been the prevailing view, although the recent decision of *United States v. Havens,* —— U.S. ——, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) holds to the contrary. 3 W. LaFave, *Search and Seizure* § 11.6(a), at 704 (1978); *see,*

*e.g., United States v. Hickey,* 596 F.2d 1082, 1088 (1st Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979) (collecting cases).

of arriving at the truth in criminal trials, as well as the defendant's obligation to speak the truth in response to proper questions." *United States v. Havens*, —— U.S. at ——, 100 S.Ct. at 1916, 64 L.Ed.2d at 565.

■ Our review of the aforementioned authorities has convinced us that the conflict between defendant's testimony on direct examination and the suppressed evidence need not be so direct as defendant contends. Circumstantial evidence may be used to impeach the defendant's testimony; it is not necessary that the excluded evidence be specifically mentioned in the defendant's testimony. *See, e. g., United States v. Tweed*, 503 F.2d 1127, 1130 (7th Cir. 1974); *Cowan v. United States*, 331 A.2d 323, 324-26 (D.C. 1975); *People v. Wise*, 46 N.Y.2d 321, 327–28, 385 N.E.2d 1262, 1266, 413 N.Y.S.2d 334, 338 (1978). Otherwise stated, a reasonable inference of inconsistency between the defendant's testimony and the excluded evidence is sufficient to permit use of the evidence for impeachment. *State v. Kidd*, 281 Md. 32, 49, 375 A.2d 1105, 1115, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977) (citing Comment, *The Impeachment Exception to the Constitutional Exclusionary Rules*, 73 Colum.L.Rev. 1476, 1485 (1973)); *see* 3 W. LaFave, *Search and Seizure* § 11.6(a), at 709–10 (1978).

■ Consistent with this standard, the Supreme Court of Georgia recently upheld the use of results of a blood test, suppressed under state statute, to impeach the defendant's testimony that her consumption of alcohol was limited to two glasses of wine in the three hours preceding the accident in which she was involved. In that case, the foundation expert testimony that such consumption would not produce the blood-alcohol level indicated by the test was offered by the plaintiff. *Ensley v. Jordan*, 244 Ga. 435, 260 S.E.2d 480 (1979) (per curiam). The case for inconsistency between the suppressed evidence and defendant's testimony is even stronger here. Not only did defendant's statement that his liquor consumption was limited to two or three drinks create an inference that his blood-alcohol level was a

percentage which was directly contradicted by the results of the breath test, the expert testimony he introduced converted his statements into a form which could be directly contradicted by the suppressed evidence. Certainly where the suppressed evidence circumstantially contradicts defendant's testimony alone and directly contradicts it when interpreted by testimony introduced by the defendant as part of his trial strategy, sufficient contradiction exists to warrant use of the suppressed evidence for impeachment purposes.

■ Our conclusion that defendant raised the issue of his blood-alcohol level by his testimony on direct examination does not conflict with defendant's assertion that criminal defendants should be able to assert their innocence by entering pleas of not guilty without fear that such pleas will open the door to use by the State of suppressed evidence for impeachment purposes. In essence, defendant here equates the facts he put in issue by his direct testimony with a general denial of the crime. We do not agree with that assessment. First, his testimony on direct examination was in the form of detailed affirmative assertions as to his version of the facts, not a bare general denial to commission of the crime charged. Secondly, those affirmative assertions did not represent flat contradictions of his commission of the crime or even of the existence of essential elements of the crime. Consumption of a particular quantity of drinks and even the accompanying inference of the presence of a particular level of alcohol in the blood were not elements of the crime charged. Of course, evidence that there is more than .1% by weight of alcohol in a defendant's blood permits an inference that the defendant is under the influence of an alcoholic beverage. § 321.-281, The Code. But only an inference is authorized; it is not conclusively established that the defendant was under the influence of intoxicating beverage. *See State v. Hansen*, 203 N.W.2d 216, 217–22 (Iowa 1972). Consequently, although defendant's statement of the number of drinks he consumed may have been related

to the essential element of being under the influence of alcoholic beverage, it was not equivalent to a denial of the existence of that element.

Moreover, defendant need not have offered evidence regarding the quantity of alcohol he had consumed in order to deny the commission of the crime. As previously indicated, defendant presented an extensive defense to the effect that his normal physical appearance might suggest to observers that he was intoxicated. He also offered proof that the accident may have been attributed to rainy weather and the hazardous intersection where the accident in question and also previous accidents had occurred. By proceeding to testify to his alcohol consumption and introducing evidence which converted that to blood-alcohol levels, he attempted to bolster his case in a manner which would have turned the suppression of the breath test to his own advantage and shielded him against contradiction. It is this sort of manipulation of the exclusionary rule which we cannot condone.

II. *The verdict-urging instruction.* Defendant's second ground of appeal is that trial court erred in giving a verdict-urging instruction. After the jury had retired and deliberated approximately six and one-half hours, defense counsel informed the court that the bailiff had indicated that the jury was hopelessly deadlocked and moved for a mistrial. The State resisted defendant's motion and requested that the jury be given a verdict-urging instruction. Trial court overruled defendant's motion, summoned the jury, learned from the foreman that the jury was unable to reach a decision and then read the requested instruction. That instruction was as follows:

> You have now been deliberating upon this case for a considerable period of time, and the Court deems it proper to advise you further in regard to the desirability of agreement if possible.
>
> The case has been exhaustively and carefully tried by both sides and at considerable expense and has been submitted to you for decision and verdict, if possible, not for disagreement. It is the law

that a unanimous verdict is required; and while this verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with a proper regard for, and deference to the opinion of each other. A proper regard for the judgment of others will greatly aid us in forming our own judgment.

> This case must be decided by some jury selected in the same manner this jury was selected, and there is no reason to think a jury better qualified would ever be chosen. Each juror should listen to the arguments of other jurors with a disposition to be convinced by them; and if the members of the jury differ in their views of the evidence, such difference of opinion should cause them all to scrutinize the evidence more closely and to re-examine the grounds of their problem. Your duty is to decide the issues of fact which have been submitted to you, if you can conscientiously do so. In conferring you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for espousing and maintaining, in a spirit of controversy, either side of a cause. The aim ever to be kept in view is the truth as it appears from the evidence, examined in the light of the instructions of the Court.

> You will again retire to your jury room and examine your differences in a spirit of fairness and candor and try to arrive at a verdict.

Our determination of the propriety of the giving of verdict-urging instructions is governed by the following principles. The ultimate test is whether the instruction improperly coerced or helped coerce a verdict or merely initiated a new train of real deliberation which terminated the disagreement. *E. g., State v. Quitt,* 204 N.W.2d 913, 914 (Iowa 1973). In applying this test, we are mindful that the trial judge has considerable discretion in determining whether the verdict-urging instruc-

tions should be given and that each case is to be decided on its own circumstances. *Id.*

Defendant claims that the instruction given here forced an agreement by the jury to his prejudice. Particularly prejudicial, he asserts, was the language of the instruction referring to the expense of trial and the necessity of the case's being decided by some jury, in combination with the advice that a proper regard for the judgment of others will aid the formation of individual judgments.

Substantially the same verdict-urging instruction as that given in this case, with certain additions in earlier instances, has apparently been used for some time by trial courts in this state. *See, e. g., State v. Cornell*, 266 N.W.2d 15, 18 (Iowa), *cert. denied*, 439 U.S. 947, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *State v. Richardson*, 137 Iowa 591, 594, 115 N.W. 220, 221–22 (1908). As noted in *Richardson*, the instruction there given was very similar to that approved in *Commonwealth v. Tuey*, 62 Mass. (8 Cush.) 1, 2–3 (1851), from which the charge cursorily approved by the United States Supreme Court was literally taken in *Allen v. United States*, 164 U.S. 492, 500–02, 17 S.Ct. 154, 157, 41 L.Ed. 528, 530–31 (1896).

Variations of the *Allen* charge, as it has come to be known,[3] have never been held per se erroneous by this court. *Cornell*, 266 N.W.2d at 19.[4] In some early cases, this court accepted *Allen*-type charges, including references to the necessity of retrial or the expense of litigation, without qualifica-

---

**3.** A paraphrase of the verdict-urging instructions approved by the Court in *Allen* is set forth at 164 U.S. at 501, 17 S.Ct. at 157, 41 L.Ed. at 530–31. Variations and amplifications of this charge have resulted from decades of judicial improvisation. "Thus it is somewhat imprecise to refer to a single *Allen* charge." *People v. Gainer*, 19 Cal.3d 835, 844–45, 566 P.2d 997, 1001–02, 139 Cal.Rptr. 861, 865–66 (1977).

In particular, we note that the instruction stating that the case must at some time be decided was approved in *Commonwealth v. Tuey*, 62 Mass. (8 Cush.) 1 (1851), but apparently not in *Allen*. *See State v. Maupin*, 42 Ohio St. 473, 485, 330 N.E.2d 708, 716 (1975). Other language in the charge given here which

tion. *Burton v. Neill*, 140 Iowa 141, 142–43, 118 N.W. 302, 302–03 (1908); *Delmonica Hotel Co. v. Smith*, 112 Iowa 659, 663–64, 84 N.W. 906, 908 (1901); *Frandsen v. C., R.I. & P.R. Co.*, 36 Iowa 372, 378–79 (1873). Subsequent opinions, however, expressed misgivings about *Allen*-type charges, also including such references. *See, e. g., State v. Mulhollen*, 173 Iowa 242, 248, 155 N.W. 252, 254 (1915) ("We have heretofore tolerated this instruction rather than commended it. To some members of the court, it is quite unsatisfactory, as being readily capable of abuse."); *Armstrong v. James & Co.*, 155 Iowa 562, 573, 136 N.W. 686, 690 (1912) (instruction "goes to the limit" and is "not to be approved as a general proposition"). Particularly objectionable was found to be certain language, deleted from the charge given here, directing only minority jurors to doubt the correctness of their judgments and to reevaluate their opinions. *See, e. g., Middle States Utilities Co. v. Incorporated Telephone Co.*, 222 Iowa 1275, 1280–82, 271 N.W. 180, 183–84 (1937); *Clemens v. Chicago, Rock Island & Pacific Railway*, 163 Iowa 499, 509, 144 N.W. 354, 357 (1913).

Despite this court's denunciations of *Allen*-type charges, reversal on grounds of its usage has been limited to cases where surrounding circumstances demonstrated prejudice. *See Middle States*, 222 Iowa at 1282, 271 N.W. at 184 (when jury polled, one juror replied that verdict not his verdict); *State v. Peirce*, 178 Iowa 417, 422–28, 159 N.W. 1050, 1053–55 (1916), *overruled on other grounds*, *State v. McLaughlin*, 250 Iowa 435, 94 N.W.2d 303 (1959) (verdict

---

is challenged by defendant, *i. e.*, that the case had been tried "at considerable expense" and that "[a] proper regard for the judgment of others will greatly aid . . . in forming [individual] judgments," was included in neither the *Tuey* nor *Allen* charges.

**4.** The United States Court of Appeals for the Eighth Circuit recently denied Cornell's petition for habeas corpus relief, which claimed that the trial judge improperly coerced a verdict by giving a supplemental instruction which was practically the same as that given here after having inquired into the jury's numerical division. *Cornell v. Iowa*, (8th Cir. 1980), *rev'g* No. 78–368–2 (S.D. Iowa Dec. 6, 1979).

reached in short time after instructions given relative to lengthy deliberations before instructions given and other circumstances); *Clemens*, 163 Iowa at 506–09, 144 N.W. at 356–58 (jury subjected to extremely long period of confinement).

In support of his position, defendant urges that we follow *People v. Barraza*, 23 Cal.3d 675, 682–85, 591 P.2d 947, 950–52, 153 Cal.Rptr. 459, 462–64 (1979), which applied a standard of presumed prejudice to a verdict-urging instruction in which the deadlocked jury was told as a central feature of the instruction that the case would have to be retried if it failed to agree upon a verdict. We decline to adopt this rigorous standard.

We do, however, agree with the assessment of the Supreme Court of California of such language as erroneous.

> It is simply not true that a criminal case "must at some time be decided." The possibility of a hung jury is an inevitable byproduct of our unanimous verdict requirement. Confronted with a mistrial, the People retain the authority to request dismissal of the action. . . . Moreover, this option is frequently exercised, as the criminal bar knows, when the prosecution concludes that its inability to obtain a conviction stemmed from deficiencies in its case.

*Barraza*, 23 Cal.3d at 683, 591 P.2d at 950–51, 153 Cal.Rptr. at 462–63 (quoting *People v. Gainer*, 19 Cal.3d 835, 852, 566 P.2d 997, 1006, 139 Cal.Rptr. 861, 870 (1977) (footnote omitted)). In the same vein, it is not inconceivable for a particular case to continually elude a unanimous verdict upon retrials. *United States v. Harris*, 391 F.2d 348, 355 (6th Cir.) *cert. denied*, 393 U.S. 874, 89 S.Ct. 169, 21 L.Ed.2d 145 (1968). Other courts have also noted the inaccuracy of the statement that a case must be decided at some time or retried by another jury. *E. g.*, *Hodges v. United States*, 408 F.2d 543, 554 (8th Cir. 1969) (Blackmun, J.); *People v. Prim*, 53 Ill.2d 62, 76–77, 289 N.E.2d 601, 610 (1972); *State v. Martin*, 297 Minn. 359, 366–69, 211 N.W.2d 765, 769–70 (1973); *State v. Lamb*, 44 N.C.App. 251, 254, 261

S.E.2d 130, 132 (1979). *But see Fulwood v. United States*, 369 F.2d 960, 963 (D.C.Cir. 1966), *cert. denied*, 387 U.S. 934, 89 S.Ct. 2058, 18 L.Ed.2d 996 (1967) (Burger, J.) (finding statement "accurate as a generality").

But the fact that such a statement is inaccurate does not mean that it is necessarily or even likely prejudicial. *See Hodges*, 408 F.2d at 554 (reference "of small consequence"); *State v. Maupin*, 42 Ohio St. 473, 485, 330 N.E.2d 708, 716 (1975) (misstatement a "slight one" and instruction containing it nonprejudicial) (quoting *Commonwealth v. Rodriguez*, 364 Mass. 87, 99, 300 N.E.2d 192, 201 (1973)); Note, *The Allen Charge: Recurring Problems and Recent Developments*, 47 N.Y.U.L.Rev. 296, 303 n.44 (1972) ("It would seem that this single addition to an otherwise proper *Allen* charge is not enough by itself to raise a presumption of coercion.") *See also Fulwood*, 369 F.2d at 963; *Hardy v. State*, 242 Ga. 702, 706, 251 S.E.2d 289, 292 (1978); *Smith v. State*, 564 P.2d 1194, 1200–01 (Wyo.1977) (instruction said to be not coercive).

In our estimation, the effect of this misinformation upon a jury's deliberations is speculative. It may have the innocuous effect of being considered by the jurors as merely a reason why they are being asked to re-examine their views. On the other hand, it may have the prejudicial effect of providing a reason for the surrender of individual judgments in order to reach a unanimous verdict. As that reason is unrelated to the proper concerns of jury deliberations, *i. e.*, the evidence, law as instructed by the court and arguments of the case, it may be said to be potentially coercive.

The same type of criticism may be made of trial court's reference to the expense of litigation. *See Taylor v. Murray*, 102 Ga. App. 145, 147–48, 115 S.E.2d 776, 778–79 (1960); *Marks Construction Co. v. Maser*, 30 Hawaii 163, 171–72, 174 (1927); *In re Stern*, 11 N.J. 584, 586–90, 95 A.2d 593, 594–95 (1953); *Pirch v. Firestone Tire & Rubber Co.*, 80 N.M. 323, 326–27, 455 P.2d 189, 192–93 (Ct. App.), *cert. denied*, 80 N.M. 316,

454 P.2d 973 (1969). *But see* 4 C. Torcia, *Wharton's Criminal Procedure* § 560, at 74 (1976) (collecting cases finding remark not objectionable). *See generally* 76 Am.Jur.2d *Trial* § 1067 (1975); Annot., 38 A.L.R.3d 1281, 1305–13 (1971); 23A C.J.S. *Criminal Law* § 1380(a), at 1016 (1961).

■ Whether or not those instructions referring to the expense of litigation and the necessity of retrial were prejudicially coercive in this case, we maintain, must be determined by an examination of the circumstances of this case, including other instructions given with those charges. *E. g., In re Estate of Cocklin*, 232 Iowa 266, 279–80, 5 N.W.2d 577, 583–84 (1942). The principal circumstance which defendant alleges indicates prejudice or an abuse of trial court's discretion here is the time within which the jury reached its verdict after receiving the verdict-urging instruction. Defendant contends that the jury returned its verdict within approximately two and one-half hours after having received the supplemental instructions and that presumably some of that time was expended for the jury's lunch. This relatively short period of time, in comparison with the assertedly lengthy prior deliberations, he claims created a presumption that the instruction was prejudicial. *See, e. g., State v. Myers*, 258 Iowa 940, 952, 140 N.W.2d 891, 898 (1966).

■ Defendant's assertions as to the length of jury deliberations following the instruction are not verified by the record. A defendant may waive error by failing to provide this court with a record which affirmatively shows the basis of the alleged error. *E. g., State v. Bakker*, 262 N.W.2d 538, 544 (Iowa 1978); *State v. Robbins*, 257 N.W.2d 63, 68 (Iowa 1977); *State v. Roberts*, 255 Iowa 166, 174, 121 N.W.2d 513, 518 (1963). *See generally* 24A C.J.S. *Criminal Law* §§ 1796–97 (1962).

Nonetheless, even assuming that defendant's time assertions are correct, we do not find that they demonstrate coercion. In *Myers*, the presumption of prejudice there articulated was considered avoided by deliberations lasting only forty-one minutes after the verdict-urging instruction was giv-

en. 258 Iowa at 952, 140 N.W.2d at 898. In *State v. Bogardus*, 188 Iowa 1293, 1299, 176 N.W. 327, 329 (1920), this court stated that the fact that the jury deliberated an hour and one-half after receiving the practically identical instruction given here showed the absence of coercion. The jury in *Bogardus* had deliberated approximately thirty hours before receiving that instruction. Also, two and one-half hours of deliberation following delivery of the *Allen* charge was considered indicative of "further worthwhile consideration before a verdict was agreed to" in *State v. Kelley*, 161 N.W.2d 123, 126 (Iowa 1968). *See generally* Annot., 97 A.L.R.3d 96, 118–19 (1980); Annot., 44 A.L.R.Fed. 468, 482 (1979).

Additionally, the jury was given the ameliorating instruction that the verdict "must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement." Finally, no special directives were addressed to only minority members, nor was the court informed by the jury of any ratio of disagreement. In short, there was no evidence of possible coercion, other than the words of the instruction themselves.

Other courts, applying similar principles to similar circumstances have reached the same conclusions. For instance, in *People v. Preston*, 76 Ill.2d 274, 285, 391 N.E.2d 359, 364, 29 Ill.Dec. 96, 101 (1979), while acknowledging that an instruction referring to the necessity of retrial was neither helpful nor correct, the court nonetheless found the instruction not coercive where the jury had deliberated six hours before and three hours after it was given. Similarly, in *Hodges*, 408 F.2d at 554, any coercion suggested by instructions referring to the expense of trial and the necessity of retrial was found dispelled by the trial court's warning against influence by the court and by the jury's five hours of deliberations following the instructions.

■ The other language of the verdict-urging instruction defendant asserts was coercive, when given in tandem with the previously discussed instructions, was, "A

proper regard for the judgment of others will greatly aid us in forming our own judgment." We fail to perceive any potential for coercion in that language. The instruction does not urge the unwilling abdication of individual judgments; it merely encourages the thoughtful consideration of all viewpoints before forming individual judgments. As such, it fosters group deliberation, which has been characterized as "a basic attribute of the jury system often expressed as a major characteristic justifying its continuance in our judicial system." [5] *United States v. Fioravanti,* 412 F.2d 407, 417 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969).

As a final note, we observe that the problematic language of the verdict-urging instruction is not included in the instruction set forth in II Iowa Uniform Jury Instructions No. 115 (1978). That instruction, which conforms to section 5.4(a) of the ABA Standards Relating to Trial by Jury, provides in part:

> The verdict must represent the considered judgment of each juror. In order to return a verdict it is necessary that each juror agrees thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with the view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own view and change your opinion if convinced it is erroneous. But do not surrender your honest convictions as to the weight or affect of the evidence solely because it is the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth.

As a matter of guidance to the trial bench, we advise that this instruction be closely followed. We have previously applauded a similar instruction as "not subject to the abuses said to attend the giving of an 'Allen' charge." *State v. Hackett,* 200 N.W.2d 493, 496 (Iowa 1972). Such an instruction has also been adopted as a replacement for the *Allen* charge in seventeen jurisdictions and as an acceptable alternative to that charge in four others. Annot., 97 A.L.R.3d 96, 108–09 (1980). The instruction recommended by the ABA standard has also received strong praise from commentators. Marcus, *The Allen Instruction in Criminal Cases: Is the Dynamite Charge About to Be Permanently Defused?,* 43 Mo. L.Rev. 613, 639 & n.140 (1978) (collecting authorities).

Use of this instruction, we believe, will direct the jury to proper considerations and lessen the prospects of uncertain appellate challenges to verdict-urging instructions. No extraneous, irrelevant and potentially coercive factors, such as jurors' majority or minority statuses, the expense of trial or the possibility of retrials, are introduced into deliberations by this instruction. Rather, the emphasis is on the proper concerns of aspiring to reach a verdict, communicating with fellow jurors and adhering to scrupulous personal convictions.

We also recommend, in accordance with the ABA standard, that the instruction be given at the conclusion of the trial, with the other instructions given to the jury before any deliberations have begun. ABA Standards Relating to Trial by Jury § 5.4(a) (Approved Draft, 1968). If it later appears that the jury cannot reach an agreement,

---

**5.** The merits of group deliberation were described in *Fioravanti* as follows:

> In reporting on psychological studies of small groups with decision-making tasks, Professor Charles W. Joiner, Dean of Wayne State University Law School, has said: "The give-and-take of group deliberation screens out errors, negates biases, and eliminates er-

roneous hypotheses to a far greater extent than individual deliberation. It was found that the interaction during deliberation was the crucial difference that made group decisions more just than a pooling of individuals without the give-and-take of deliberation.

412 F.2d at 417 (quoting Civil Justice and the Jury 26–27 (Prentice-Hall 1962)).

the trial court may repeat the instruction before requiring continued deliberations. *Id.* § 5.4(b).

The principal reason for giving the instruction as part of the main charge to the jury is that it lessens the possibility of any coercive impact the instruction might have. *See, e. g., United States v. Simpson*, 445 F.2d 735, 736 (D.C.Cir. 1970) (per curiam); *People v. Viser*, 62 Ill.2d 568, 585, 343 N.E.2d 903, 912 (1975); *Alcala v. State*, 487 P.2d 448, 461 (Wyo.1971), *cert. denied*, 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466 (1972); ABA Standards Relating to Trial by Jury § 5.4(a) Commentary, at 147 (Approved Draft, 1968). After the jury is deadlocked, it is particularly vulnerable to suggestions as to how it should proceed. The evidence, law and arguments have already failed to convince the jurors what the verdict should be. This is the "crucial stage when the jury looks to the bench for advice on how to solve their dilemma." *People v. Gainer*, 19 Cal.3d 835, 854, 566 P.2d 997, 1008, 139 Cal.Rptr. 861, 872 (1977). Furthermore, giving the instruction before deliberations begin forewarns the jury how to proceed in a manner that may forestall a deadlock. *State v. Martin*, 297 Minn. 359, 372–73, 211 N.W.2d 765, 772 (1973).

In conclusion, we hold that no error was committed in the giving of the verdict-urging instruction in the circumstances of this case and that evidence regarding the administration and results of a breath test performed on defendant was properly admitted for purposes of impeaching defendant's testimony on direct examination. Therefore, the judgment of conviction is affirmed.

AFFIRMED.

All Justices concur except LeGRAND, J., who concurs in the result.